1  RON BENDER (SBN 143364)
   BETH ANN R. YOUNG (SBN 143945)
2  TODD M. ARNOLD (SBN 221868)
   LEVENE, NEALE, BENDER, YOO & BRILL LLP
3  10250 Constellation Blvd., Suite 1700
   Los Angeles, CA 90067
4  Telephone: (310) 229-1234 / Fax: (310) 229-1244
   Email: rb@lnbyb.com, bry@lnbyb.com, tma@lnbyb.com
5
   Attorneys for Debtors and Debtors in Possession
6
   SCOTT J. LEIPZIG (SBN 192005)
7  MICHAEL S. GREGER (SBN 156525)
   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
8  1901 Avenue of the Stars, Suite 1800
   Los Angeles, CA 90067-6019
9  Telephone: (310) 788-2400 / Fax: (310) 788-2410
   Email: sleipzig@allenmatkins.com, mgreger@allenmatkins.com
10
   Special Litigation and Real Estate Counsel for Debtors and Debtors in Possession
11

12            **UNITED STATES BANKRUPTCY COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14            **LOS ANGELES DIVISION**

15

16

17  In re:                              Case No.: 2:17-bk-17991-BB

18  PAUL S. SHEPHERD and                Chapter 11 Case
    GIGI R. SHEPHERD,
19                                      **DEBTORS' NOTICE OF MOTION AND**
           Debtors and Debtors in Possession.   **MOTION TO APPROVE SETTLEMENT**
20                                      **BY AND BETWEEN THE DEBTORS, ON**
                                        **ONE HAND, AND THE LOS ANGELES**
21                                      **CONSERVANCY, ON THE OTHER**
                                        **HAND; MEMORANDUM OF POINTS**
22                                      **AND AUTHORITIES AND**
                                        **DECLARATION IN SUPPORT THEREOF**
23

24                                      **Hearing:**
                                        Date:  March 21, 2018
25                                      Time:  10:00 a.m.
                                        Place: Courtroom 1539
26                                             255 E. Temple Street
                                               Los Angeles, California 90012
27

28

                                        1

**PLEASE TAKE NOTICE** that a hearing will be held at the above-referenced date, time, and location to consider this motion (the "9019 Motion") filed by Paul S. Shepherd and Gigi R. Shepherd, the chapter 11 debtors and debtors in possession herein (the "Debtors"), pursuant to Fed. R. Bankr. P. 9019 ("Rule 9019") and Local Bankruptcy Rule ("LBR") 9013-1, for the entry of an order approving the Settlement Agreement and Release (the "Settlement Agreement"), a copy of which is attached hereto as **Exhibit "1,"** entered into by and between the Debtors, on one hand, and the Los Angeles Conservancy, a California nonprofit corporation (the "Conservancy" and, together with the Debtors, the "Parties"), on the other hand.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(f), any opposition to this 9019 Motion must be (1) in writing and include all reasons and evidence in support of the opposition, (2) filed at least fourteen (14) days prior to the hearing on this 9019 Motion, and (3) served on the United States Trustee and counsel for the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the Court may deem the failure of any party to file a timely opposition to this 9019 Motion to constitute consent to the granting of this 9019 Motion and the relief requested therein.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

(1)     Granting this 9019 Motion;

(2)     Approving the Settlement Agreement and the terms thereof;

(3)     Authorizing the Parties to take any actions required to perform under the Settlement Agreement and the terms thereof; and

(4)     Granting such other and further relief as the Court deems just and proper.

Dated: February 28, 2018               PAUL S. SHEPHERD and GIGI R. SHEPHERD,

                                       By:     /s/ Todd M. Arnold
                                               RON BENDER
                                               BETH ANN R. YOUNG
                                               TODD M. ARNOLD
                                       LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
                                       Attorneys for Debtors and Debtors in Possession

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I. STATEMENT OF FACTS.................................................................................................... 1

    A.    GENERAL BACKGROUND................................................................................ 1

    B.    THE DEBTORS' REAL PROPERTY, THE VALUE THEREOF, AND
           CLAIMS AGAINST THE DEBTOR. ..................................................................... 1

    C.    THE DEBTORS' INDEBTEDNESS AND FINANCIAL PRESSURES
           LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE.................. 2

    D.    THE DEBTORS' EXIT STRATEGY, EFFORTS TOWARDS
           EXITING BANKRUPTCY, AND THE CONSERVANCY'S
           ALLEGED VIOLATION OF THE AUTOMATIC STAY.................................... 3

    E.    THE DISPUTE BETWEEN THE DEBTORS AND THE
           CONSERVANCY AND THE SETTLEMENT AGREEMENT........................... 6

II. THE SETTLEMENT AGREEMENT AND THE TERMS THEREOF  SHOULD BE
    APPROVED ......................................................................................................................... 9

    A.    THE BANKRUPTCY RULES ALLOW THE COURT TO APPROVE
           THE SETTLEMENT AGREEMENT AND THE TERMS THEREOF................ 9

    B.    CASE LAW SUPPORTS APPROVAL OF THE SETTLEMENT
           AGREEMENT AND THE TERMS THEREOF. ................................................. 10

           1.    Probability of Success............................................................................... 11

           2.    Impediments to Collection........................................................................ 12

           3.    Complexity, Expense, Inconvenience and Delay of Litigation. ............... 12

           4.    The Interest of Creditors with Deference to their Reasonable Opinions.. 12

III. CONCLUSION................................................................................................................ 13

DECLARATION OF PAUL S. SHEPHERD......................................................................... 14

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re A & C Properties*,
   784 F.2d 1377 (9th Cir. 1986) ...........................................................................10, 11

*In re Blair*,
   538 F.2d 849 (9th Cir. 1976) .....................................................................................10

*In re General Store of Beverly Hills*,
   11 B.R. 539 (B.A.P. 9th Cir. 1981).............................................................................10

*In re Heissenger Resources Ltd.*,
   67 B.R. 378 (C.D. Ill 1986) ......................................................................................10

*Langnes v. Green*,
   282 U.S. 531 (1931) ..................................................................................................10

*In re Woodson*,
   839 F.2d 610,620 (9th Cir. 1988) ..............................................................................10

**Other State Cases**

*Keros v. Paul Shepherd et al.*
   (Case No. BC654456) ..............................................................................................2, 3

**Federal Statutes**

11 U.S.C.
   § 101 et seq. .............................................................................................................1, 2
   § 362............................................................................................................................6
   § 362(b)(4) ..................................................................................................................6
   § 362(b)(4) ...........................................................................................................11, 12
   §§ 1107 and 1108.......................................................................................................1

**Other Authorities**

Fed. R. Bankr. P. 9019(a) .................................................................................................9

# MEMORANDUM OF POINTS AND AUTHORITIES[1]

## I.

## STATEMENT OF FACTS

### A.    GENERAL BACKGROUND.

On June 30, 2017 (the "Petition Date"), the Debtors commenced their bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").[2]    The Debtors are operating their estate and managing their financial affairs as debtors in possession pursuant to Sections 1107 and 1108.    An Official Committee of Unsecured Creditors has not been formed.

### B.    THE DEBTORS' REAL PROPERTY, THE VALUE THEREOF, AND CLAIMS AGAINST THE DEBTOR.

The Debtors live on their real property, which is comprised of two contiguous parcels: (1) 2460 Sunset Plaza Drive, Los Angeles, CA 90069 (APN 5563-031-011) (the "Upper Lot"), an approximately 1.5 acre lot on which is located the Debtors' principal residence (the "Residence"), and (2) 2375 Sunset Plaza Drive, Los Angeles, CA 90069 (APN 5563-031-012) (the "Lower Lot" and together with the Upper Lot, the "Property"), an adjacent approximately 1 acre lot of undeveloped land.    The Property was inherited by the Debtors from Mrs. Shepherd's aunt, who purchased the Property in 1954 and tended after the Property until her passing in 2004, when the Property was transferred to the Debtors.

The Debtors believe the Property, which is the Debtors' primary asset, has a collective fair market value of between approximately $8 and $10 million (or more), provided that the Property is not designated as a Historical-Cultural Monument ("Designate," "Designated," or "Designation").

On July 7, 2017, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules").    As set forth in the Schedules, as of the Petition Date, the Debtors had

---

[1] Any capitalized terms not otherwise defined herein have the same meanings as set forth in the preceding Notice of 9019 Motion and 9019 Motion.

[2] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

1  approximately $110,000 in secured claims and $1,297,424 in general unsecured claims for a

2  total of approximately $1,407,424 in claims.  As further discussed below, after the Petition

3  Date, the Debtors reached a settlement (the "Keros Settlement") with Nicholas Keros

4  ("Keros") and his entity Thrasher NK, LLC ("Thrasher").

5          The Keros Settlement, which was approved by an order of the Court, provides that if

6  the Debtors do not make a payment of $2.125 million to Thrasher by no later than March 31,

7  2018, then Keros may file a declaration that the payment was not timely received together with

8  an order dismissing the Debtors' Bankruptcy Case, with prejudice.

9  **C.    THE DEBTORS' INDEBTEDNESS AND FINANCIAL PRESSURES LEADING
10        TO COMMENCEMENT OF THIS CHAPTER 11 CASE**

11         While the Property is valued at between $8 to $10 million (or maybe more), provided

12  the Property is not Designated, the Debtors' ordinary monthly living expenses far exceed their

13  monthly income.  Given that all their monthly income is already consumed by ordinary living

14  expenses in providing support for themselves and their two children, the Debtors had to resort

15  to borrowing substantial amounts to fund, among other things, the costs associated with other

16  litigation relating to easements on the Property (which the Debtors and others successfully

17  defended).  Indeed, in total, during the years leading up to their bankruptcy filing, the Debtors

18  had to borrow more than $1,200,000 in order to fund their negative cash flow.  That took a

19  heavy toll on the Debtors and their already precarious financial condition.

20         The Debtors could not indefinitely operate on a negative cash flow basis.  To pay off

21  their debt and fund their future living expenses, the Debtors made the difficult decision to sell

22  their beloved Property.  Unfortunately, as detailed in several prior pleadings filed with the

23  Court, and summarized again briefly herein, the Debtors' effort to sell the Property and pay

24  their creditors turned into a nightmare for the Debtors.

25         Consistent with the Debtors' goal of selling the Property to pay their existing creditors

26  and other expenses and to fund their retirement, on the evening of March 5, 2017, the Debtors

27  and Keros met concerning a potential sale of the Property by the Debtors to Keros and entered

28

into that certain Residential Purchase Agreement and Joint Escrow Instructions (the "Keros Purchase Agreement"). As has been recounted in multiple pleadings, the Debtors contended that the Debtors were defrauded by Keros together with real estate broker, Douglas Elliman and Douglas Elliman real estate agent Joshua Altman. The Debtors further contended that the Keros Purchase Agreement was invalid and unenforceable either on its face, or was properly terminated by the Debtors. In response to the Debtors' position regarding the Keros Purchase Agreement, on March 17, 2017, Keros initiated an action in state court styled *Keros v. Paul Shepherd et al.* (Case No. BC654456) (the "State Court Action") by filing a complaint against the Debtors and others pertaining to the purported Keros Purchase Agreement. Also on March 17, 2017, in connection with filing the State Court Action, Keros recorded a Notice of Pendency of Action (Lis Pendens) against the Property (the "*Lis Pendens*").

Although Debtors provided Keros with two opportunities to close the Keros Purchase Agreement, Keros failed to close or pay the purchase price, instead choosing to litigate with the Debtors in the State Court Action and cause the Debtors to incur crushing expenses in connection therewith, which Debtors could no longer, if ever, afford to do. With their borrowing sources tapped out, and the *Lis Pendens* on the Property, making traditional financing impossible, the Debtors had literally no source of funds for their basic living needs, much less to fund expensive, disputed litigation. Without funds from the sale of the Property, the Debtors were forced to commence their Bankruptcy Case. It is through this Bankruptcy Case that Debtors hope to finally monetize the Property in order to pay Debtors' creditors and provide a source of funds for the living expenses of the Debtors and their two children.

**D.    THE DEBTORS' EXIT STRATEGY, EFFORTS TOWARDS EXITING BANKRUPTCY, AND THE CONSERVANCY'S ALLEGED VIOLATION OF THE AUTOMATIC STAY.**

Both prior to and after the Petition Date, the Debtors have been seeking to sell their Property in order to fund living and other expenses and a plan of reorganization paying allowed claims in full. Soon after the Petition Date, on July 26, 2017, in furtherance of their efforts to sell the Property, the Debtors filed an application to employ Hilton & Hyland

("H&H") as their real estate broker in connection with the marketing and sale of the Property [Dkt. 24]. On August 18, 2017, the Court entered an order approving the H&H employment application [Dkt. 48]. On or about August 24, 2017, H&H listed the Property for sale.

While H&H engaged in substantial marketing efforts to sell the Property, the Debtors ultimately entered into a Residential Purchase Agreement and Joint Escrow Instructions and related agreements (the "RND Purchase Agreement") with RND Sunset Associates, LLC ("RND") acting through Robert Flaxman, pursuant to which the Property would be sold to RND for $8.5 million, subject to overbid.

The Debtors assert that, on October 26, 2017, with knowledge of the Debtors' Bankruptcy Case, the Conservancy filed a Nomination Form (the "Nomination Application") with the City of Los Angeles' Cultural Heritage Commission (the "Commission") seeking to have the  Commission designate the Debtors' Property as a Historic-Cultural Monument, which initiated an administrative process with the Commission to Designate the Property.

On October 30, 2017, the Debtors filed their motion (the "Sale Motion") [Dkt. 99], seeking, inter alia, an order (1) to the extent the Keros Purchase Agreement was valid and enforceable, approving the rejection of the Keros Purchase Agreement, (2) approving a sale of the Property to RND pursuant to the RND Purchase Agreement for a purchase price of $8.5 million, subject to the Court's approval and overbid, and (3) approving overbid procedures for an auction of the Property. A sale of the property to RND or an overbidder for $8.5 million or more would have provided the estate with sufficient net proceeds to pay all allowed claims, plus administrative claims incurred in the Bankruptcy Case, in full. Keros filed an opposition to the Sale Motion [Dkt. 116], and the Debtors filed a reply thereto [Dkt. 120]

In addition to opposing the Sale Motion, Keros also filed a motion seeking to dismiss the Debtors' Bankruptcy Case as a bad faith filing (the "Dismissal Motion") [Dkt. 95]. The Debtors filed an opposition to the Dismissal Motion [Dkt. 114], and Keros filed a reply thereto [Dkt. 118].

1    On November 16, 2017, the Commission, based solely on the Nomination Application

2    submitted by the Conservancy, conducted its initial consideration of the Property for

3    Designation as a Historic-Cultural Monument, concluded that the Nomination Application

4    merited further review, and took the Nomination Application under submission.

5    On November 21, 2017, the Commission sent the Debtors a letter indicating that the

6    Commission had determined that the Nomination Application to designate the Property as a

7    Historic-Cultural Monument merited further review and that a sub-committee of the

8    Commission had scheduled a site visit to the Property on December 14, 2017.

9    On November 29, 2017, (1) just prior to the commencement of the hearing on the Sale

10   Motion, RND delivered a letter (the "11/29/17 Letter") to the Debtors' counsel purporting to

11   cancel the RND Purchase Agreement based on the Nomination Application filed by

12   Conservancy, and the Commission's resulting 5-0 vote to take the Property under

13   consideration, (2) the Commission appeared at the Sale Hearing through the Los Angeles City

14   Attorney, and (3) the Conservancy appeared at the Sale Hearing and represented to the Court

15   that the Conservancy would work with the Debtors to resolve issues regarding the requested

16   Designation of the Property as a Historic-Cultural Monument.  A true and correct copy of the

17   11/29/17 Letter is attached hereto as **Exhibit "2."**  As a result, the Court did not conduct a

18   hearing on the Sale Motion and the Debtors withdrew the Sale Motion [Dkt. 127].

19   Prior to the hearing on the Dismissal Motion, the Debtors and Keros reached a

20   settlement resolving, *inter alia*, the Dismissal Motion and Keros' opposition to the Sale Motion

21   and any future motions to sell the Property (the "Keros Settlement").  The Debtors filed a

22   motion to approve the Keros Settlement [Dkt. 122] and, on December 12, 2017, the Court

23   entered an order approving the Keros Settlement [Dkt. 133].

24   The Keros Settlement provides for, among other things, the Debtors to pay Thrasher a

25   settlement payment of $2.125 million by no later than March 31, 2018.  In the event the

26   settlement payment is not timely paid, Keros can submit a declaration with the Court which

27   would result in the Debtors' case being dismissed with prejudice.  A sale of the Property or a

28

1  financing secured by the Property are the only viable means for funding the Keros Settlement

2  payment.  Therefore, since entering into the Keros Settlement, the Debtors have continued to

3  pursue a sale of the Property and efforts to obtain financing necessary to make the foregoing

4  settlement payment.

5  **E.    THE DISPUTE BETWEEN THE DEBTORS AND THE CONSERVANCY AND**

6  **THE SETTLEMENT AGREEMENT.**

7      The Debtors assert that the Residence is not eligible for Designation as a Historic-

8  Cultural Monument and that the filing of the Nomination Application by the Conservancy

9  constitutes a violation of the automatic stay imposed pursuant to Section 362.  The Debtors'

10  further assert that, based on the alleged violation of the automatic stay by the Conservancy and

11  the resulting failure of the Debtors to close a sale of the Property to RND or an overbidder

12  pursuant to the RNS Purchase Agreement and Sale Motion, the Conservancy is liable to the

13  Debtors for damages for, among other things, (1) the fees and costs incurred in connection with

14  (a) the negotiation and drafting of the RND Purchase Agreement for a sale of the Property, (b)

15  the preparation and filing of the Sale Motion to approve the sale of the Property under the

16  RND Purchase Agreement, (c) the preparation of the response to the Keros opposition to the

17  Sale Motion, and (d) the preparation for the hearing on the Sale Motion, (2) the profit that

18  would have been obtained from the sale of the Property to RND or an overbidder, (3) increased

19  costs resulting from the termination of the RND Purchase Agreement and the sale thereunder,

20  and delay in pursuing an alternate sale, (4) any fees and expenses incurred by the Debtors

21  litigating with RND regarding the disposition of the deposit made by RND under the RND

22  Purchase Agreement, and (5) any diminution in the value of the Property resulting from the

23  Conservancy's efforts to Designate the Property and the initiation of the Designation process.

24      The Conservancy (1) disputes the Debtors allegations regarding the purported violation

25  of the automatic stay, (2) asserts that the Conservancy did not violate the automatic stay and/or

26  that its actions were not subject to the automatic stay pursuant to the police/regulatory power

27  exception under Section 362(b)(4), and (3) asserts that the Conservancy is not liable for any

28

1  damages based on the Conservancy's conduct.

2         In consideration of the foregoing facts, and after protracted, arms-length negotiations

3  between the Parties, the Parties have agreed, subject to Court approval, to settle the alleged

4  claims of the Parties upon the terms and conditions set forth in the Settlement Agreement, a true

5  and correct copy of which is attached hereto as **Exhibit "1."**

6         In summary, the Settlement Agreement includes, *inter alia*, the following terms and

7  conditions:[3]

8         1.      Effective Date:  The Settlement Agreement will become effective on the

9  later of (a) the date on which fully executed counterpart originals of the Settlement

10  Agreement have been exchanged by the Parties, and (b) the date on which the

11  Settlement Agreement has been approved by the Court ("Effective Date"). In the event

12  the Court declines to enter an order approving the Settlement Agreement for any reason

13  or if the order approving the Settlement Agreement is vacated on appeal, then the

14  Settlement Agreement shall become null and void and of no force and effect whatsoever.

15         2.      Release: As of the Effective Date, the Debtors will be deemed to have

16  provided a general release to the Conservancy and its attorneys, representatives, assigns,

17  and successors-in-interest from any and all claims relating to the filing by the

18  Conservancy of the Nomination Application or any other action taken by the

19  Conservancy related to the Debtors or the Property prior to the execution of the

20  Settlement Agreement.

21         3.      Relocation:  The Conservancy shall not oppose (whether directly or

22  indirectly), and shall support, in connection with any administrative proceedings and

23  otherwise, the relocation of the Residence to an alternate property that shall be identified

24  in the future (the "Alternate Property"), subject to certain conditions set forth in the

25  Settlement Agreement.

26  _____

27  [3] This summary is for informational purposes only.  In the event of any inconsistency between the summary of settlement terms set forth herein, on one hand, and actual terms of the Settlement Agreement, the Settlement Agreement shall control.

28

4.      <u>Maintenance:</u>  Except as set forth in the Settlement Agreement, until such time as the Residence is relocated from the Property per the terms of the Settlement Agreement, neither the Debtors nor their successors or assigns with respect to the Property (which successors or assigns shall be bound by the Settlement Agreement) shall take any actions to demolish, disassemble, or otherwise alter the Residence (inclusive of applying for a permit to take any of the foregoing actions) in a way that would result in a substantial adverse change to its existing condition or its eligibility, if any, as a historic resource (unless otherwise required due to exigent circumstances related to substantial damage to or destruction of the Residence by natural causes or disaster not caused by or contributed to by the Debtors or their agents, provided that the Debtors or their successors shall provide reasonable advance written notice to the Conservancy of the existence of such exigent circumstances prior to the Debtors or their successors taking any action otherwise prohibited by this paragraph of the Settlement Agreement).  Prior to a relocation of the Residence, and to the extent the then owner of the Property is in compliance with this section of the Settlement Agreement and there are no other breaches or defaults under this Agreement by such owner, the Conservancy shall not file a Nomination Application or directly or indirectly assist any third party in doing so; provided, however, if the then owner of the Property elects to preserve the Residence at the Property, nothing herein shall prohibit the Conservancy from filing a Nomination Application upon such election.

5.      <u>Approval of Alternate Property.</u>  The Conservancy shall have the right, but not the obligation, to reasonably approve the Alternate Property for the purpose of determining that the Alternate Property is suitable for the placement of the Residence in a manner that will not significantly impair its eligibility, if any, for designation as a historic resource. In making its determination under this section of the Settlement Agreement, if at all, the Conservancy shall act in a reasonable and good faith manner so as to preserve the benefits of the Settlement Agreement for the Debtors or their

successor(s) in interest. Notwithstanding the foregoing or any other provision of the Settlement Agreement, the Conservancy acknowledges and agrees that the Alternate Property may not be substantially similar to the Property with respect to such factors as size, location, views or quality and any such dissimilarity shall not be grounds for the Conservancy to withhold, condition, or delay its approval of the Alternate Property so long as the Conservancy is able to reasonably determine in good faith that any dissimilarity of the Alternate Property to the Property with respect to such factors will not significantly impair the eligibility of the Residence, if any, for designation as a historic resource.

6. <u>Exception for Keros.</u> In order to not impair and to preserve all of Keros' actual or contingent rights to the Property (all of which the Debtors dispute), to the extent Keros (or any entity or person affiliated with Keros) is successful in acquiring title to the Property at any time by means of litigation, arbitration or other court action, the Settlement Agreement shall be null and void and of no force and effect; provided, however, that the release from the Debtors in favor of the Conservancy as set forth in the Settlement Agreement shall survive any such termination of the Settlement Agreement.

7. <u>Memorandum of Agreement.</u> The Parties shall record a Memorandum of the Settlement Agreement in the Official Records of Los Angeles County, California, within ten (10) days after the Effective Date.

## II.

## THE SETTLEMENT AGREEMENT AND THE TERMS THEREOF

## SHOULD BE APPROVED

**A.    THE BANKRUPTCY RULES ALLOW THE COURT TO APPROVE THE SETTLEMENT AGREEMENT AND THE TERMS THEREOF.**

Rule 9019(a) states that "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The decision of whether a compromise or settlement should be accepted or

1  rejected lies within the sound discretion of the Court. *See, e.g., In re A & C Properties*, 784

2  F.2d 1377 (9th Cir. 1986).

3      Sound discretion is judicial power exercised fairly and equitably. As the Supreme Court

4  noted, the term "discretion" denotes the absence of a hard and fast rule:

5           When invoked as a guide to judicial action, it means a sound
             discretion, that is to say, a discretion exercised not arbitrarily or
6           willfully, but with regard to what is right and equitable under the
             circumstances and the law, and directed by the reasonableness and
7           conscience of the judge to a just result.

8

9  *Langnes v. Green*, 282 U.S. 531, 541 (1931).

10     The Ninth Circuit has recognized that "the bankruptcy court has great latitude in

11  approving settlements." *In re Woodson*, 839 F.2d 610,620 (9th Cir. 1988); *see, also e.g., A & C*

12  *Properties*, 784 F.2d 1377 (9th Cir. 1986); *In re Blair*, 538 F.2d 849 (9th Cir. 1976). For the

13  reasons set forth below, the Court should approve the proposed Settlement Agreement and the

14  terms and conditions thereof.

15  **B.    CASE LAW SUPPORTS APPROVAL OF THE SETTLEMENT AGREEMENT
         AND THE TERMS THEREOF.**
16

17     It is well-established that, as a matter of public policy, settlements are favored over

18  continued litigation. *See e.g., A & C Properties*, 784 F.2d at 1381 (9th Cir. 1986); *Blair*, 538

19  F.2d at 851.

20     The focus of inquiry in reviewing and approving compromises is whether the settlement

21  is reasonable under the particular circumstances of the case. *See In re General Store of Beverly*

22  *Hills*, 11 B.R. 539 (B.A.P. 9th Cir. 1981). It is not the bankruptcy judge's responsibility to

23  decide the numerous questions of law and fact with respect to the merits of the litigation, but

24  rather to "canvas the issues and see whether the settlement falls below the lowest point of the

25  range of reasonableness." *In re Heissenger Resources Ltd.*, 67 B.R. 378, 383 (C.D. Ill 1986).

26     Among the factors to be considered in determining whether a settlement is fair, equitable

27  and reasonable are the following:

28

(1)      the probability of success in the litigation;

(2)      any impediments to collection;

(3)      the complexity, expense, inconvenience and delay of litigation; and

(4)      the interest of creditors with deference to their reasonable opinions.

*A & C Properties*, 784 F.2d at 1381.

An analysis of the foregoing factors in this case demonstrates that the Settlement and the terms thereof set forth in the Settlement Order are fair and equitable and well within the range of reasonableness.

## 1.   **Probability of Success.**

The Settlement Agreement resolves the Debtors' alleged claims against the Conservancy arising from the Conservancy's purported violation of the automatic stay resulting from the filing of the Nomination Application and other conduct described above. While the Debtors' believe that the Conservancy's conduct violated the automatic stay, the Conservancy has asserted that its conduct did not violate the automatic stay and/or that its actions were not subject to the automatic stay pursuant to the police/regulatory power exception under Section 362(b)(4). In consideration of the foregoing, the Debtors believe that the probability of succeeding on claims against the Conservancy is not certain.

More importantly, in the event that the Debtors are not able to make the settlement payment to Thrasher by March 31, 2018 as required by the Keros Settlement, the Debtors Bankruptcy Case may be dismissed pursuant to the terms of the Keros Settlement. If that occurs, it is possible that the Debtors may not be able to pursue their purported claims against the Conservancy based on the Conservancy's alleged violation of the automatic stay. The Settlement Agreement, on the other hand, ensures that, assuming certain conditions of the Settlement Agreement are met, the Debtors will receive cooperation and support from the

Conservancy in connection with relocating the Residence to an Alternate Property and any proceedings conducted in connection therewith.

## 2.  Impediments to Collection.

The Debtors are currently unaware of whether or not the Conservancy would be able to satisfy some or all of any judgment entered against it.  However, even if the Conservancy has sufficient assets to pay some or all of any judgment, the Conservancy could appeal any judgment against it and/or refuse to voluntarily pay any judgment against it and require the Debtors to seek involuntary enforcement of any judgment.

## 3.  Complexity, Expense, Inconvenience and Delay of Litigation.

The issues of whether the Conservancy violated the automatic stay and whether the Conservancy is a quasi-governmental entity such that its conduct would be excepted from the automatic stay pursuant to the police/regulatory power exception under Section 362(b)(4) are moderately complex.

Any litigation of the Debtors' purported claims against the Conservancy would cause the estate to incur material litigation expenses, and such litigation (and any related appeals) would likely take many months to come to a final conclusion.   Further, in the event of litigation and in the absence of the Settlement Agreement, there would be material delay in the Debtors' efforts to relocate the Residence to an Alternate Property and to otherwise resolve any claims that the Property is subject to historical preservation, which, if successful, will likely substantially increase the value of the Debtors' Property.

## 4.  The Interest of Creditors with Deference to their Reasonable Opinions.

The Settlement Agreement avoids all of the aforementioned detrimental consequences resulting from the litigation of the Debtors' purported claims against the Conservancy.  More importantly, as discussed above, the Settlement Agreement ensures the Debtors will receive cooperation and support from the Conservancy in connection with relocating the Residence to an Alternate Property and any proceedings conducted in connection therewith.  Such relocation and the resulting resolution of any claim that the Residence is subject to historical conservation

will make the Property more marketable, because there will be no clouds on title or uncertainty regarding whether the Residence can be moved and the Property can be fully developed.  The foregoing would likely materially increase the value of the Property and the number of buyers interested in it, as well as the likelihood that the Debtors are able to expeditiously close a sale of the Property.  All of the foregoing will benefit creditors, because, without a sale of the Property, the Debtors have no means to satisfy creditor claims.

In consideration of the foregoing, the Debtors believe that the Settlement Agreement and the terms and conditions thereof are fair, reasonable, and in the best interests of the estate and its creditors.

## III.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtors respectfully request that the Court enter an order:

(1)     Granting the 9019 Motion;

(2)     Approving the Settlement Agreement and the terms thereof;

(3)     Authorizing the Parties to take any actions required to perform under the Settlement Agreement and the terms thereof; and

(4)     Granting such other and further relief as the Court deems just and proper.

Dated: February 28, 2018           PAUL S. SHEPHERD and GIGI R. SHEPHERD,

By:     */s/ Todd M. Arnold*
        RON BENDER
        BETH ANN R. YOUNG
        TODD M. ARNOLD
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
Attorneys for Debtors and Debtors in Possession

## <u>DECLARATION OF PAUL S. SHEPHERD</u>

I, Paul S. Shepherd, hereby declare as follows:

1.      I am over 18 years of age.   Except where otherwise stated, I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.      I make this declaration in support of the 9019 Motion and Memorandum to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the 9019 Motion and Memorandum.

3.      My wife, Gigi R. Shepherd, and I ("<u>we</u>" or "<u>us</u>"), are the Chapter 11 debtors and debtors in possession in the above-captioned Chapter 11 case.

4.      On June 30, 2017 (the "<u>Petition Date</u>"), we commenced our Bankruptcy Case by filing a voluntary petition under Chapter 11.  We are operating our estate and managing our financial affairs as debtors in possession.  An Official Committee of Unsecured Creditors has not been formed.

5.      On June 30, 2017 (the "<u>Petition Date</u>"), we commenced our bankruptcy case (the "<u>Bankruptcy Case</u>") by filing a voluntary petition under Chapter 11.  We are operating our estate and managing our financial affairs as debtors in possession.   An Official Committee of Unsecured Creditors has not been formed.

6.      We live on our real property, which is comprised of two contiguous parcels: (1) 2460 Sunset Plaza Drive, Los Angeles, CA 90069 (APN 5563-031-011) (the "<u>Upper Lot</u>"), an approximately 1.5 acre lot on which is located our principal residence (the "<u>Residence</u>"), and (2) 2375 Sunset Plaza Drive, Los Angeles, CA 90069 (APN 5563-031-012) (the "<u>Lower Lot</u>" and together with the Upper Lot, the "<u>Property</u>"), an adjacent approximately 1 acre lot of undeveloped land.  The Property was inherited by us from my wife's aunt, who purchased the Property in 1954 and tended after the Property until her passing in 2004, when the Property was transferred to us.

7.      I believe the Property, which is our primary asset, has a collective fair market

value of between approximately $8 and $10 million (or more), provided that the Property is not designated as a Historical-Cultural Monument ("Designate," "Designated," or "Designation").

8.    On July 7, 2017, we filed our Schedules of Assets and Liabilities (the "Schedules").  As set forth in the Schedules, as of the Petition Date, we had approximately $110,000 in secured claims and $1,297,424 in general unsecured claims for a total of approximately $1,407,424 in claims.  As further discussed below, after the Petition Date, we reached a settlement (the "Keros Settlement") with Nicholas Keros ("Keros") and his entity Thrasher NK, LLC ("Thrasher").

9.    The Keros Settlement, which was approved by an order of the Court, provides that if we do not make a payment of $2.125 million to Thrasher by no later than March 31, 2018, then Keros may file a declaration that the payment was not timely received together with an order dismissing our Bankruptcy Case, with prejudice.

10.    While the Property is valued at between $8 to $10 million (or maybe more), provided the Property is not Designated, our ordinary monthly living expenses far exceed our monthly income.  Given that all our monthly income is already consumed by ordinary living expenses in providing support for us and our two children, we had to resort to borrowing substantial amounts to fund, among other things, the costs associated with other litigation relating to easements on the Property (which we and others successfully defended).  Indeed, in total, during the years leading up to their bankruptcy filing, we had to borrow more than $1,200,000 in order to fund our negative cash flow.  That took a heavy toll on us and our already precarious financial condition.

11.    We could not indefinitely operate on a negative cash flow basis.  To pay off our debt and fund our future living expenses, we made the difficult decision to sell our beloved Property.  Unfortunately, as detailed in several prior pleadings filed with the Court, and summarized again briefly herein, our effort to sell the Property and pay our creditors turned into a nightmare.

12.    Consistent with our goal of selling the Property to pay our existing creditors and

other expenses and to fund our retirement, on the evening of March 5, 2017, we and Keros met concerning a potential sale of the Property by us to Keros and entered into that certain Residential Purchase Agreement and Joint Escrow Instructions (the "<u>Keros Purchase Agreement</u>").   As has been recounted in multiple pleadings, we contended that we were defrauded by Keros together with real estate broker, Douglas Elliman and Douglas Elliman real estate agent Joshua Altman.   We further contended that the Keros Purchase Agreement was invalid and unenforceable either on its face, or was properly terminated by us.   In response to our position regarding the Keros Purchase Agreement, on March 17, 2017, Keros initiated an action in state court styled *Keros v. Paul Shepherd et al.* (Case No. BC654456) (the "<u>State Court Action</u>") by filing a complaint against us and others pertaining to the purported Keros Purchase Agreement.   Also on March 17, 2017, in connection with filing the State Court Action, Keros recorded a Notice of Pendency of Action (Lis Pendens) against the Property (the "*<u>Lis Pendens</u>*").

13.    Although we provided Keros with two opportunities to close the Keros Purchase Agreement, Keros failed to close or pay the purchase price, instead choosing to litigate with us in the State Court Action and cause us to incur crushing expenses in connection therewith, which we could no longer, if ever, afford to do.   With our borrowing sources tapped out, and the *Lis Pendens* on the Property, making traditional financing impossible, we had literally no source of funds for our basic living needs, much less to fund expensive, disputed litigation.   Without funds from the sale of the Property, we were forced to commence our Bankruptcy Case.   It is through this Bankruptcy Case that we hope to finally monetize the Property in order to pay our creditors and provide a source of funds for our living expenses and those of our two children.

14.    Both prior to and after the Petition Date, we have been seeking to sell our Property in order to fund living and other expenses and a plan of reorganization paying allowed claims in full.   Soon after the Petition Date, on July 26, 2017, in furtherance of their efforts to sell the Property, we filed an application to employ Hilton & Hyland ("<u>H&H</u>") as our real estate broker in connection with the marketing and sale of the Property [Dkt. 24].   On August 18, 2017, the Court entered an order approving the H&H employment application [Dkt. 48].   On or about

1    August 24, 2017, H&H listed the Property for sale.

2         15.     While H&H engaged in substantial marketing efforts to sell the Property, we

3    ultimately entered into a Residential Purchase Agreement and Joint Escrow Instructions and

4    related agreements (the "RND Purchase Agreement") with RND Sunset Associates, LLC

5    ("RND") acting through Robert Flaxman, pursuant to which the Property would be sold to RND

6    for $8.5 million, subject to overbid.

7         16.     We assert that, on October 26, 2017, with knowledge of our Bankruptcy Case, the

8    Conservancy filed a Nomination Form (the "Nomination Application") with the City of Los

9    Angeles' Cultural Heritage Commission (the "Commission") seeking to have the  Commission

10   designate our Property as a Historic-Cultural Monument, which initiated an administrative

11   process with the Commission to Designate the Property.

12        17.     On October 30, 2017, we filed our motion (the "Sale Motion") [Dkt. 99], seeking,

13   *inter alia*, an order (1) to the extent the Keros Purchase Agreement was valid and enforceable,

14   approving the rejection of the Keros Purchase Agreement, (2) approving a sale of the Property to

15   RND pursuant to the RND Purchase Agreement for a purchase price of $8.5 million, subject to

16   the Court's approval and overbid, and (3) approving overbid procedures for an auction of the

17   Property.  A sale of the property to RND or an overbidder for $8.5 million or more would have

18   provided the estate with sufficient net proceeds to pay all allowed claims, plus administrative

19   claims incurred in the Bankruptcy Case, in full.  Keros filed an opposition to the Sale Motion

20   [Dkt. 116], and we filed a reply thereto [Dkt. 120]

21        18.     In addition to opposing the Sale Motion, Keros also filed a motion seeking to

22   dismiss our Bankruptcy Case as a bad faith filing (the "Dismissal Motion") [Dkt. 95].  We filed

23   an opposition to the Dismissal Motion [Dkt. 114], and Keros filed a reply thereto [Dkt. 118].

24        19.     On November 16, 2017, the Commission, based solely on the Nomination

25   Application submitted by the Conservancy, conducted its initial consideration of the Property for

26   Designation as a Historic-Cultural Monument, concluded that the Nomination Application

27   merited further review, and took the Nomination Application under submission.

28

20.    On November 21, 2017, the Commission sent us a letter indicating that the Commission had determined that the Nomination Application to designate the Property as a Historic-Cultural Monument merited further review and that a sub-committee of the Commission had scheduled a site visit to the Property on December 14, 2017.

21.    On November 29, 2017, (1) just prior to the commencement of the hearing on the Sale Motion, RND delivered a letter (the "11/29/17 Letter") to our counsel purporting to cancel the RND Purchase Agreement based on the Nomination Application filed by Conservancy, and the Commission's resulting 5-0 vote to take the Property under consideration, (2) the Commission appeared at the Sale Hearing through the Los Angeles City Attorney, and (3) the Conservancy appeared at the Sale Hearing  and represented to the Court that the Conservancy would work with us to resolve issues regarding the requested Designation of the Property as a Historic-Cultural Monument.  A true and correct copy of the 11/29/17 Letter is attached hereto as **Exhibit "2."**  As a result, the Court did not conduct a hearing on the Sale Motion and we withdrew the Sale Motion [Dkt. 127].

22.    Prior to the hearing on the Dismissal Motion, we and Keros reached a settlement resolving, *inter alia*, the Dismissal Motion and Keros' opposition to the Sale Motion and any future motions to sell the Property (the "Keros Settlement").  We filed a motion to approve the Keros Settlement [Dkt. 122] and, on December 12, 2017, the Court entered an order approving the Keros Settlement [Dkt. 133].

23.    The Keros Settlement provides for, among other things, us to pay Thrasher a settlement payment of $2.125 million by no later than March 31, 2018.  In the event the settlement payment is not timely paid, Keros can submit a declaration with the Court which would result in our case being dismissed with prejudice.  A sale of the Property or a financing secured by the Property are the only viable means for funding the Keros Settlement payment.  Therefore, since entering into the Keros Settlement, we have continued to pursue a sale of the Property and efforts to obtain financing necessary to make the foregoing settlement payment.

24.    We assert that the Residence is not eligible for Designation as a Historic-Cultural

Monument and that the filing of the Nomination Application by the Conservancy constitutes a violation of the automatic stay imposed pursuant to Section 362.  We further assert that, based on the alleged violation of the automatic stay by the Conservancy and the resulting failure to close a sale of the Property to RND or an overbidder pursuant to the RNS Purchase Agreement and Sale Motion, the Conservancy is liable to us for damages for, among other things, (1) the fees and costs incurred in connection with (a) the negotiation and drafting of the RND Purchase Agreement for a sale of the Property, (b) the preparation and filing of the Sale Motion to approve the sale of the Property under the RND Purchase Agreement, (c) the preparation of the response to the Keros opposition to the Sale Motion, and (d) the preparation for the hearing on the Sale Motion, (2) the profit that would have been obtained from the sale of the Property to RND or an overbidder, (3) increased costs resulting from the termination of the RND Purchase Agreement and the sale thereunder, and delay in pursuing an alternate sale, (4) any fees and expenses incurred by us litigating with RND regarding the disposition of the deposit made by RND under the RND Purchase Agreement, and (5) any diminution in the value of the Property resulting from the Conservancy's efforts to Designate the Property and the initiation of the Designation process.

25.    The Conservancy (1) disputes our allegations regarding the purported violation of the automatic stay, (2) asserts that the Conservancy did not violate the automatic stay and/or that its actions were not subject to the automatic stay pursuant to the police/regulatory power exception under Section 362(b)(4), and (3) asserts that the Conservancy is not liable for any damages based on the Conservancy's conduct.

26.    In consideration of the foregoing facts, and after protracted, arms-length negotiations between the Parties, the Parties have agreed, subject to Court approval, to settle the alleged claims of the Parties upon the terms and conditions set forth in the Settlement Agreement, a true and correct copy of which is attached hereto as **Exhibit "1."**

/ / /

/ / /

27.    In consideration of the reasons set forth in the preceding 9019 Motion and the Memorandum in support thereof, I believe that the Settlement Agreement and the terms and conditions thereof are fair, reasonable, and in the best interests of the estate and its creditors.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of February 2018, at Los Angeles, California.

_____
PAUL S. SHEPHERD

# EXHIBIT "1"

## SETTLEMENT AGREEMENT AND RELEASE

This SETTLEMENT AGREEMENT AND RELEASE ("Agreement") is made and entered into as of the 23rd day of February, 2018, by and between the Los Angeles Conservancy, a California nonprofit corporation ("Conservancy"), on the one hand, and Paul S. Shepherd and Gigi R. Shepherd, each an individual in their capacities as debtors in possession (the "Shepherds"), on the other hand.  The Conservancy and the Shepherds are each sometimes individually referred to herein as a "Party" and, collectively, as the "Parties."

### RECITALS

A.    The Shepherds are the owners of that certain real property located at 2460 North Sunset Plaza Drive (the "Property") in the City of Los Angeles, California ("City"), which is currently developed with a single family dwelling (the "Residence").

B.    On June 30, 2017, the Shepherds filed a joint voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing that certain bankruptcy case pending before the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court"), captioned *In re Paul S. Shepherd and Gigi R. Shepherd*, Case No. 2:17-bk-17911-BB (the "Bankruptcy Case").  The Shepherds are debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    On October 26, 2017, the Conservancy filed a Nomination Form with the City seeking to designate the Residence as a Historic-Cultural Monument (the "Nomination Application").

D.    The Shepherds contend that the Residence is not eligible for designation as a Historic-Cultural Monument and that the filing of the Nomination Application by the Conservancy constitutes a violation of the automatic stay imposed pursuant to section 362 of the Bankruptcy Code in the Bankruptcy Case.  The Conservancy contends otherwise.  The Parties have nevertheless met and conferred and have agreed to work cooperatively and in good faith to seek a mutually satisfactory resolution to their differences, which resolution may include preservation on site or the relocation of the Residence to an alternate property that shall be identified in the future (the "Alternate Property").

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Effective Date</u>:  This Agreement will become effective on the later of (i) the date on which fully executed counterpart originals of the Agreement have been exchanged by the Parties, and (ii) the date on which the Agreement has been approved by the Bankruptcy Court ("Effective Date").  In the event the Bankruptcy Court declines to enter an order approving the Agreement for any reason or if the order approving the Agreement is vacated on appeal, then this Agreement shall become null and void and of no force and effect whatsoever.

2.     Release:  As of the Effective Date, the Shepherds hereby release the Conservancy and its attorneys, representatives, assigns, and successors-in-interest from any and all claims, causes of action, actions, damages, losses, demands, accounts, reckonings, rights, debts, liabilities, obligations, disputes, controversies, payments, costs, and attorneys' fees, of every kind and character, known or unknown, existing or contingent, latent or patent, arising out of or relating to the filing by the Conservancy of the Nomination Application or any other action taken by the Conservancy related to the Shepherds or the Property prior to the execution of this Agreement.  The Parties, and each of them, understand the principles of California Civil Code § 1542 which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Each Party to this Agreement acknowledges that it is aware and that it may hereafter discover facts in addition to or different from those which it now knows or believes to be true with respect to the subject matter of this Agreement, but that, except as otherwise provided in this Agreement, it is the intention of each Party to this Agreement to hereby fully, finally and forever settle, release and discharge all claims, known or unknown, suspected or unsuspected, which now exist, may in the future exist or heretofore existed between the Parties to this Agreement and hereby waives its rights under Civil Code § 1542.  In furtherance of such intention, the releases and discharges given herein shall be and shall remain in effect as full and complete releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

3.     Relocation.  The Conservancy shall not oppose (whether directly or indirectly), and shall support, in connection with any administrative proceedings and otherwise, the relocation of the Residence to the Alternate Property, subject to the following:

3.1     The relocation and reconstruction of the Residence shall be conducted substantially in accordance with the applicable guidelines and procedures described in the following publications; provided however, and notwithstanding the foregoing, the Conservancy acknowledges and agrees that (i) in order to relocate the Residence, the Residence will need to be disassembled and transported in approximately twelve (12)-foot to fourteen (14)-foot sections, (ii) the reconstruction of the Residence on the Alternate Property may be limited to the reassembly and restoration of the Residence to its current condition and shall not require the recreation or replacement of any physical features not currently existing in,  on  or appurtenant to the Residence; (iii) the guidelines and publications below shall be applied by the Conservancy in a reasonable and good faith manner so as to preserve the benefits of this Agreement for the Shepherds or their successor(s) in interest.  The Shepherds agree that the Conservancy shall be provided a detailed record of the disassembly of the Residence, and such disassembly shall be conducted in such a manner to minimize any irreparable damage to the existing physical features of the Residence:

- *The Secretary of the Interior's Standards for the Treatment of Historic Buildings*, dated 2017: https://www.nps.gov/tps/standards/treatment-guidelines-2017.pdf

- *National Park Service guidance on eligibility and Seven Aspects of Integrity*: https://www.nps.gov/nr/publications/bulletins/nrb15/nrb15_8.htm.

- *National Park Service guidance on reconstruction of historic properties*: https://www.nps.gov/tps/standards/four-treatments/treatment-reconstruction.htm.

- *Moving Historic Buildings*, by John Obed Curtis, dated 1979: https://www.nps.gov/tps/how-to-preserve/preservedocs/Moving-Historic-Buildings.pdf.

3.2     Prior to a relocation of the Property, the Residence shall be properly documented as it relates to the existing condition of the Residence in accordance with Historic American Buildings Survey Guidelines, inclusive of major drawings and photographs.

3.3     The relocation of the Residence shall comply with all applicable laws and regulations, inclusive of building permits, relocation permits, etc.

3.4     As a condition to any transfer of title to the Residence for relocation, the Shepherds or their successor(s) in interest shall provide reasonable assurance to the Conservancy that the financial obligation of the relocation (inclusive of the cost of the Alternate Property and the reconstruction of the Residence on the Alternate Property) has been taken into consideration by the Shepherds and any purchaser of the Residence.  The Conservancy shall have no right to object to any such transfer under this Section 3.4 so long as the Shepherds or their successor(s) in interest provide the aforementioned reasonable assurances.

3.5     The Shepherds shall require the purchaser of the Residence for purposes of relocation to complete the reconstruction of the Residence on the Alternate Property as set forth in this Agreement within 24 months of the date on which the Residence is relocated to the Alternate Property.

3.6     The Shepherds shall require the purchaser of the Residence for purposes of relocation (i) to maintain the Residence following such reconstruction in a manner that will not significantly impair its eligibility, if any, as a historic resource, and (ii) to support any subsequent effort by the Conservancy following the relocation of the Residence to nominate the Residence as a Historic-Cultural Monument.

3.7.    The Conservancy shall be granted access to the Alternate Property at reasonable times and subject to reasonable notice of the purchaser of the Residence to confirm compliance with Sections 3.5 and 3.6 hereof.

4.      Maintenance.  Except as set forth in this Agreement, until such time as the Residence is relocated from the Property per the terms of this Agreement, neither the Shepherds nor their successors or assigns with respect to the Property (which successors or assigns shall be bound by this Agreement) shall take any actions to demolish, disassemble, or otherwise alter the Residence (inclusive of applying for a permit to take any of the foregoing actions) in a way that would result in a substantial adverse change to its existing condition or its eligibility, if any, as a historic resource (unless otherwise required due to exigent circumstances related to substantial damage to or destruction of the Residence by natural causes or disaster not caused by or contributed to by the Shepherds or their agents, provided that the Shepherds or their successors shall provide reasonable advance written notice to the Conservancy of the existence of such exigent circumstances prior to the Shepherds or their successors taking any action otherwise prohibited by this paragraph).  Prior to a relocation of the Residence, and to the extent the then owner of the Property is in compliance with this Section 4 and there are no other breaches or defaults under this Agreement by such owner, the Conservancy shall not file a Nomination Application or directly or indirectly assist any third party in doing so; provided, however, if the then-owner of the Property elects to preserve the Residence at the Property, nothing herein shall prohibit the Conservancy from filing a Nomination Application upon such election.

5.      Approval of Alternate Property.  The Conservancy shall have the right, but not the obligation, to reasonably approve the Alternate Property for the purpose of determining that the Alternate Property is suitable for the placement of the Residence in a manner that will not significantly impair its eligibility, if any, for designation as a historic resource.  In making its determination under this Section, if at all, the Conservancy shall act in a reasonable and good faith manner so as to preserve the benefits of this Agreement for the Shepherds or their successor(s) in interest.  Notwithstanding the foregoing or any other provision of this Agreement, the Conservancy acknowledges and agrees that the Alternate Property may not be substantially similar to the Property with respect to such factors as size, location, views or quality and any such dissimilarity shall not be grounds for the Conservancy to withhold, condition, or delay its approval of the Alternate Property so long as the Conservancy is able to reasonably determine in good faith that any dissimilarity of the Alternate Property to the Property with respect to such factors will not significantly impair the eligibility of the Residence, if any, for designation as a historic resource.

6.      Exception for Bankruptcy Creditor.  Nicholas Keros ("Keros") is a creditor of the Shepherds in the Bankruptcy Case.  Keros has certain contingent claims to the Property in a separate litigation matter he commenced in Los Angeles Superior Court (Case No. BC654456). In order to not impair and to preserve all of Keros' actual or contingent rights to the Property (all of which the Shepherds dispute), to the extent Keros (or any entity or person affiliated with Keros) is successful in acquiring title to the Property at any time by means of litigation, arbitration or other court action, this Agreement shall be null and void and of no force and effect; provided, however, that the Release from the Shepherds in favor of the Conservancy as set forth in Section 2 hereof shall survive any such termination of this Agreement.  The Shepherds shall keep the Conservancy reasonably informed of any litigation activity that may result in transfer of title to Keros and shall notify the Conservancy of any such transfer of title to Keros within three (3) business days of such transfer.

7.      No Waiver.  No waiver by either Party of any breach of or default under this Agreement shall be deemed to be a waiver of any other breach or default of any kind or nature, and no acceptance of payment or performance by either Party after any such breach or default shall be deemed to be a waiver of any breach or default of this Agreement, whether or not such Party knows of such breach or default at the time it accepts such payment or performance.  No failure or delay on the part of either Party to exercise any right it may have shall prevent the exercise thereof by such Party at any time during which the other Party may continue to be in default, and no such failure or delay shall operate as a waiver of any default.

8.      Attorneys' Fees.  In the event either Party shall institute any action or proceeding against the other Party to enforce the terms of this Agreement, the unsuccessful Party in such action or proceeding shall reimburse the successful Party for its disbursements incurred in connection therewith and for its reasonable attorneys' fees as fixed by the court.  In addition to the foregoing award of attorneys' fees to the successful Party, the successful Party in any lawsuit on this Agreement shall be entitled to its attorneys' fees incurred in any post-judgment proceedings to collect or enforce the judgment.  This provision is separate and several and shall survive any merger of this Agreement into any judgment on this Agreement.

9.      Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

10.     Severability.  The invalidity or unenforceability of any provision of this Agreement, as determined by a court of competent jurisdiction, shall in no way affect the validity or enforceability of any other provision hereof.

11.     Authority.  Each Party acknowledges and represents that the persons signing on its behalf have been authorized to enter into this Agreement.

12.     Notice.  Each Party to this Agreement shall provide the other Party notice of any claimed breach and shall afford said Party a five (5) day period within which to cure any such breach prior to taking any other action under this Agreement on account of such claimed breach. Any notice, demand or other communication required or permitted by this Agreement shall be in writing and shall be given by personal delivery (including by a courier or express service); or sent by certified United States mail, postage prepaid, to the following addresses, or such other addresses as may be from time to time specified by notice given in accordance with this paragraph; or by facsimile transmission to the facsimile number set forth below:

|  |  |
|---|---|
| **If to the Conservancy:** | The Los Angeles Conservancy |
|  | 523 West Sixth Street, Suite 826 |
|  | Los Angeles, California  90014 |
|  | Attn:  Linda Dishman |
|  | Telephone:  (213) 623-2489 |
|  | Facsimile:  (213) 623-3909 |
|  |  |
| **With copies to:** | Seyfarth Shaw LLP |
|  | 333 S. Hope Street, Suite 3900 |

|                        | Los Angeles, California 90071 |
|------------------------|-------------------------------|
|                        | Telephone:  213-270-9655      |
|                        | Facsimile:  310-551-8433      |
|                        | Attention:  Stacy Paek        |

**If to the Shepherds:**  Paul and Gigi Shepherd
2460 North Sunset Plaza Drive
Los Angeles, California  90069
Telephone:  (323) 650-1200

**With copies to:**  Allen Matkins Leck Gamble Mallory & Natsis LLP
1901 Avenue of the Stars, Suite 1800
Los Angeles, California  90067
Telephone:  (310) 788-2400
Facsimile:  (310) 788-2410
Attention:  Scott J. Leipzig, Esq.

A notice shall be deemed received:  (i) upon receipt if delivered in person, (ii) the next business day following delivery to a courier service for next business day delivery, (iii) three (3) business days after deposit in the U.S. mail, certified with postage prepaid and return receipt requested, or (iv) if by facsimile transmission, at the time that receipt thereof has been acknowledged by electronic confirmation or otherwise.

13.    <u>No Presumption/Headings</u>.  The Parties have cooperated in the drafting of this Agreement and any rule of construction based on the drafter's identity shall not be applied to any ambiguity in this Agreement.  Section headings are for reference purposes only and shall not be used for interpreting the meaning of any provisions of this Agreement.

14.    <u>Amendment</u>.  This Agreement may not be amended except in a writing signed by all of the Parties hereto.

15.    <u>No Third Party Beneficiaries / Agreement Runs with Land</u>.  There are no third party beneficiaries to this Agreement, and this Agreement is not intended, and shall not be construed to benefit or be enforceable by any other persons or entities other than the Parties hereto.  Notwithstanding the foregoing, this Agreement shall run with the land and inure to the benefit of subsequent owners, successors or assigns  of the Property (except Keros), and shall be directly enforceable by the Conservancy against all such subsequent owners, successors or assigns of the Property (except Keros).  For the avoidance of doubt, this Agreement shall be binding on (i) any purchaser of the Property prior to relocation in accordance with Section 3 hereof other than Keros, and (ii) any purchaser of the Residence.  The Shepherds hereby agree that as a condition to the acquisition of the Property and/or the Residence, as applicable, such purchaser(s) shall acknowledge their obligations under this Agreement in writing to the Conservancy.

16.    <u>Entire Agreement</u>.  This Agreement contains the entire agreement and understanding concerning the subject matter hereof and supersedes and replaces all other prior negotiations or proposed agreements, written or oral, concerning the subject matter of this

Agreement, including, without limitation, that certain Standstill Agreement dated as of January 16, 2018 by and between the Conservancy and the Shepherds.  Each of the Parties hereto acknowledges that no other party, nor the agents nor the attorneys for any Party, has made any promise, representation or warranty whatsoever, express or implied, not contained herein, to induce the execution of this Agreement and acknowledges that this Agreement has not been executed in reliance upon any promise, representation or warranty not contained herein.

17.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, including by facsimile and electronic transmission, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

18.    <u>Memorandum of Agreement</u>.  The Parties shall record a Memorandum of this Agreement in the Official Records of Los Angeles County, California, within ten (10) days after the Effective Date.

*(Signatures Provided on Following Page)*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above.

**THE LOS ANGELES CONSERVANCY,**
**a California nonprofit corporation**

By: ___*Linda Dishman*___
      Name: ___*Linda Dishman*___
      Title: ___*President & CEO*___

**PAUL S. SHEPHERD,**
**an individual**

By: _____
      Paul S. Shepherd

**GIGI R. SHEPHERD,**
**an individual**

By: _____
      Gigi R. Shepherd

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above.

**THE LOS ANGELES CONSERVANCY,**
**a California nonprofit corporation**

By:  _____
    Name:  _____
    Title:  _____

**PAUL S. SHEPHERD,**
**an individual**

By:  _____
    Paul S. Shepherd

**GIGI R. SHEPHERD,**
**an individual**

By:  _____
    Gigi R. Shepherd

# EXHIBIT "2"

**Eric J. Lorenzini**
D: 310.746.4436
F: 310.746.4486
ELorenzini@elkinskalt.com



ELKINS
KALT
WEINTRAUB
REUBEN
GARTSIDE LLP

November 29, 2017

## VIA HAND DELIVERY

Scott Liepzig
Allen Matkins Leck Gamble Mallory & Natsis
LLP1901 Avenue of the Stars, Suite 1800
Los Angeles, California 90067-6019
sleipzig@allenmatkins.com

Ron Bender
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
rb@lnbyb.com

> Re:    Residential Purchase Agreement and Joint Escrow Instructions (the
> "Agreement") between RND Sunset Associates, LLC ("Buyer") and Paul
> and Gigi Shepherd ("Sellers"), dated October 27, 2017, for the property at
> 2375 and 2460 Sunset Plaza Drive, Los Angeles (the "Property")

Dear Scott and Ron:

On November 22, 2017, Buyer became aware that the Los Angeles Cultural Heritage Commission voted 5-0 to take the property under consideration as a Historic-Cultural Monument, based on the Los Angeles Conservancy's nomination of the Property, and to adopt the report findings.

Pursuant to Paragraph 43.B of the Agreement, within ten (10) days of Buyer becoming aware that any portion of the Property is subject to a taking or written threat of a taking by a public or governmental authority, Buyer shall notify Seller in writing whether Buyer elects to terminate the Agreement and receive a return of the Deposit pursuant to Paragraph 42 and 43 of the Agreement.

The actions of the Los Angeles Cultural Heritage Commission constitute a threatened taking of some or all of the Property. Buyer hereby gives notice that it elects to terminate the Agreement due to the threatened taking and demands return of its Deposit.

Sincerely,

ERIC J. LORENZINI
Elkins Kalt Weintraub Reuben Gartside LLP

2049 Century Park East, Suite 2700, Los Angeles, California  90067-3202
Telephone: 310.746.4400  Facsimile 310.746.4499  www.elkinskalt.com

872500v1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90017.

A true and correct copy of the foregoing document entitled **DEBTORS' NOTICE OF MOTION AND MOTION TO APPROVE SETTLEMENT BY AND BETWEEN THE DEBTORS, ON ONE HAND, AND THE LOS ANGELES CONSERVANCY, ON THE OTHER HAND; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On _**February 28, 2018**_, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M Arnold    tma@lnbyb.com
- Ron Bender    rb@lnbyb.com
- Michael I Gottfried    mgottfried@lgbfirm.com, srichmond@lgbfirm.com;emeza@lgbfirm.com;njanbay@lgbfirm.com
- Michael S Greger    mgreger@allenmatkins.com
- Kenneth G Lau    kenneth.g.lau@usdoj.gov
- Ron Maroko    ron.maroko@usdoj.gov
- Uzzi O Raanan    uor@dgdk.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com
- David B Shemano    dshemano@robinskaplan.com
- Valerie Smith    claims@recoverycorp.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Beth Ann R Young    bry@lnbyb.com

**2. SERVED BY UNITED STATES MAIL**: On _**February 28, 2018**_, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Hon. Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _**February 28, 2018,**_ I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 28, 2018 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| _Date_ | _Printed Name_ | _Signature_ |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Label Matrix for local noticing
0973-2
Case 2:17-bk-17991-BB
Central District of California
Los Angeles
Wed Feb 28 11:19:57 PST 2018

Allen Matkins Leck Gamble Mallory & Natsis
1901 Avenue of the Stars
Suite 1800
Los Angeles, CA 90067-6019

Levene Neale Bender Yoo & Brill LLP
10250 Constellation Blvd Ste 1700
Los Angeles, CA 90067-6253

Los Angeles Division
255 East Temple Street,
Los Angeles, CA 90012-3332

Allen Matkins Leck Gamble
Mallory & Natsis LLP
1901 Avenue of the Stars, 18th Fl
Los Angeles CA 90067-6001

Bank of America
P.O. Box 15168
Wilmington, DE 19850-5168

David M. Bass/Michael D. Murphy
Gerard Fox Law, P.C.
1880 Century Park East, Suite 1410
Los Angeles, CA 90067-2350

Douglas Elliman
Agent for Service: C T Corporation
818 West 7th Street, Suite 930
Los Angeles, CA 90017-3476

Douglas Elliman
c/o Colin Keenan, Sr. VP-Mng Broker
150 El Camino Drive
Beverly Hills, CA 90212-2733

Ellen Hargitay
2370 Sunset Plaza Dr.
Los Angeles, CA 90069-1209

Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

Force-Nagler, LLC
1868 North Doheny Drive
Los Angeles, CA 90069-1110

Force-Nagler, LLC
c/o Ms. Judy Nagler, Agent for Serv
13622 Gault Street
Van Nuys, CA 91405-3408

Franchise Tax Board
Bankruptcy Section, MS: A-340
P.O. Box 2952
Sacramento, CA 95812-2952

Glenn Stevens
355 North Canon Drive
Beverly Hills, CA 90210-4704

Inez Shepherd
3209 Shoreheight Street
Las Vegas, NV 89117-3319

Internal Revenue Service  IRS
P.O. Box 7346
Philadelphia, PA 19101-7346

LA County Office of the Assessor
500 W Temple St.
Los Angeles, CA 90012-2713

LA DWP
P.O. Box. 30808
Los Angeles, CA 90030-0808

LOS ANGELES COUNTY TREASURER AND TAX COLLECT
PO BOX 54110
LOS ANGELES CA 90054-0110

Mercury Insurance
PO Box 11991
Santa Ana, CA 92711-1991

Mr. Josh Altman
The Altman Brothers
150 El Camino Drive
Beverly Hills, CA 90212-2733

Ms. Judy Nagler
1868 North Doheny Drive
Los Angeles, CA 90069-1110

Nicholas Keros
301 N. Lake Ave. Ste 1002
Pasadena CA 91101-4148

Nicholas Keros
c/o David M. Bass/Michael D. Murphy
Gerard Fox Law, P.C.
1880 Century Park East, Suite 1410
Los Angeles, CA 90067-2350

PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541-1021

Pacific Specialty Company
2200 Geng Road
Suite 200
Millbrae, CA 94030

Sprint
PO Box 629023
El Dorado Hills, CA 95762-9023

(p)SPRINT NEXTEL CORRESPONDENCE
ATTN BANKRUPTCY DEPT
PO BOX 7949
OVERLAND PARK KS 66207-0949

Synchrony Bank
c/o PRA Receivables Management, LLC
PO Box 41021
Norfolk VA 23541-1021

Time Warner Cable
Attn: Recovery Support
3347 Platt Springs Road
West Columbia, SC 29170-2203

Traveler's Insurance
PO Box 660307
Dallas, TX 75266-0307

United States Trustee (LA)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560


Beth Ann R Young
Levene, Neale, Bender, Yoo & Brill L.L.P
10250 Constellation Blvd Ste1700
Los Angeles, CA 90067-6253

GiGi Renee Shepherd
2460 Sunset Plaza Drive
Los Angeles, CA 90069-1211

Nicholas Keros
Robins Kaplan LLP
2049 Century Park East
Suite 3400
Los Angeles, CA 90067-3208


Paul Stuart Shepherd
2460 Sunset Plaza Drive
Los Angeles, CA 90069-1211

Ron Bender
Levene, Neale, Bender, Yoo & Brill L.L.P
10250 Constellation Blvd Ste 1700
Los Angeles, CA 90067-6253

Todd M Arnold
Levene, Neale, Bender, Yoo & Brill L.L.P
10250 Constellation Blvd Ste 1700
Los Angeles, CA 90067-6253


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Sprint Corporation
Tarek Robbiati, CFO
6200 Sprint Parkway
Overland Park, Kansas 66251


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(u)Courtesy NEF

(u)Douglas Elliman of California, Inc.

(u)Force-Nagler, LLC


(u)Hilton Hyland

(u)Pacific Union International, Inc. aka Part

(d)Nicholas Keros
301 N. Lake Ave. Ste 1002
Pasadena CA 91101-4148


(u)Joshua Altman

(u)Judy Nagler

(u)Robert Flaxman


End of Label Matrix
Mailable recipients    38
Bypassed recipients     9
Total                  47